**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------x
AWAD RAGUNAUTH,

                              **Petitioner,**

         **- against -**

**ROBERT ERCOLE,** *Superintendent,*
*Green Haven Correctional Facility,*

                              **Respondent.**
-------------------------------------------------------------------x

                                                          **OPINION &ORDER**

                                                          **07 CV 1692 (NG)**

**GERSHON, United States District Judge:**

    *Pro se* petitioner Awad Ragunauth brings this petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, alleging that he is being held in custody in violation of the Constitution and laws of the United States pursuant to judgment of a court of the State of New York. For the reasons stated below, petitioner's application for a writ of habeas corpus is denied.

## PROCEDURAL HISTORY

    On February 10, 2004, following a jury trial in New York Supreme Court, Queens County, petitioner was convicted of two counts of robbery in the first degree, N.Y. Penal Law §160.15(1), assault in the first degree, N.Y. Penal Law § 120.10(1), and criminal possession of a weapon in the second degree, N.Y. Penal Law §265.03. On December 5, 2005, the Appellate Division affirmed the conviction, and, on January 13, 2006, a judge of the New York Court of Appeals denied petitioner's application for leave to appeal. *People v. Ragunauth*, 24 A.D.3d 472 (2d Dep't 2005), *lv. denied*, 6 N.Y.3d 729 (2006). On August 16, 2006, petitioner moved to vacate the judgment against him pursuant to N.Y. Criminal Procedure Law § 440.10. On November 28, 2006, the court denied petitioner's motion to vacate the judgment. On February 27, 2007, the Appellate Division denied leave to appeal.

# BACKGROUND

## I.    Motion to Suppress

Prior to trial, petitioner filed a motion to suppress his pretrial statement and the identification evidence against him. At a pretrial hearing, New York City Police Department Detective Kevin Meehan testified as to the events leading to petitioner's arrest. On June 7, 2002 at 11:30 p.m., Meehan was assigned to investigate the robbery and shooting of Roman Dualsky that took place on Jamaica Avenue between 256th and 257th Streets. On June 8, 2002 at approximately 1:30 a.m., in the emergency room at Winthrop Hospital, Meehan interviewed Dualsky who described his attacker as a tall and slim Hispanic or Indian male, approximately 19 years of age, wearing all black clothing and a rubber hat. Dualsky told Meehan that he was in pain but he was not on any pain medications.

At approximately 2:15 a.m., at the 105th Precinct, Meehan met with Tinesha Maragh, an eyewitness to the robbery and shooting. Using a force field computer,[1] Meehan showed Maragh arrest photos of males fitting the description given by Dualsky. After viewing over 1,000 photographs, Maragh selected a four-year-old photograph of petitioner at age 17, and told Meehan, "that's him, that's the guy who did it." H: 9[2]. Meehan then printed the photograph and memorialized it by having Maragh sign the back. Because of a computer malfunction, Meehan was unable to preserve the photographs that appeared on the computer screen alongside petitioner's photograph.

---

[1]    A force field computer allows a user to input descriptive information of an assailant and then provides arrest photographs of individuals who fit that description. The photographs appear on the screen six at a time. H: 27-28.

[2]    References to "H" are to pages of the Hearing Transcript attached to the State's Opposition to Mr. Ragunauth's Habeas Petition.

At approximately 3:00 p.m., Meehan returned to Winthrop Hospital and interviewed Dualsky who further described the perpetrator as being approximately 5'9" tall and 140 pounds, having a "baby face," and wearing a silver chain and black cap. He never described his attacker as having facial hair. Meehan then showed Dualsky a photo array containing five fillers and a copy of the photograph of petitioner picked by Maragh, all of which had the height, weight, and age of the individuals printed next to their photographs. The filler photos in the array included an 18-year-old, a 20-year-old, a 21-year-old, a 22-year-old, and a 23-year-old. The array listed the 18-year-old's height as 5'1". After viewing the array, Dualsky selected the picture of petitioner stating, "I believe this is the person who robbed me at gunpoint. I need to see him in person to be sure." H: 14, 36.

On June 13, 2002, at the 105th Precinct, Dualsky viewed "several" photos from the force field computer, none of which depicted petitioner; he did not select any photos from the computer. Meehan then showed Dualsky the same photo array he had viewed at the hospital. Dualsky again chose the defendant's picture and said, "that's the guy," and indicated he would like to see him in person. H: 17.

On June 18, 2002, based on the photo identifications by Maragh and Dualsky, Meehan arrested petitioner in the driveway of his home at 94-36 236th Street and transported him in handcuffs to the 105th Precinct. At the precinct, Meehan informed petitioner of the charges against him but did not give petitioner Miranda warnings. When asked where he was on the date and time in question, petitioner stated he didn't know where he was or what he was doing on that date.

On June 19, 2002, at 12:10 a.m., Meehan prepared and conducted a sitting lineup that included petitioner and five fillers. At that time, Meehan knew petitioner was 21-years-old, 5'8"

tall, and 120 pounds. Petitioner chose to be number six in the lineup. The second person in the lineup was 6'0" and 230 pounds and the fifth person in the lineup told Meehan he was 5'10" and 185 pounds. Although the prosecution was present at the lineup, defense counsel was not.

Dualsky and Maragh entered the precinct separately, viewed the lineup separately, and had no contact between viewings. Although Maragh asked for petitioner to face the lineup window, she ultimately concluded she did not recognize anyone. Dualsky then viewed the lineup and immediately picked out petitioner stating, "number six, that's the guy that shot me." H: 21. Meehan then took a picture of the lineup.

Following Meehan's testimony at the hearing, defense counsel argued that petitioner's statement and the identification evidence should be suppressed. He argued that the identification evidence should be suppressed because both the pretrial photo array and the lineup were impermissibly suggestive, and the lineup was further tainted by the suggestive photo array. He argued that the photo array shown to Dualsky was suggestive because defendant was the only individual in the array fitting Dualsky's description of the assailant as a tall, thin, Indian, teenaged male, and because it included printed identification information that could have easily been removed. He argued that the fillers in their twenties were inappropriate because they appeared "much, much older than the seventeen year old defendant" and three of them had mustaches and goatees, which the victim never described. H: 51. In addition, he argued the filler in his teens was inappropriate because he was only 5'1" tall. Defendant further argued the lineup was suggestive and tainted by the suggestive photo array. Although defense counsel admitted one individual in the lineup was a perfect filler, he argued the other four appeared to be the wrong age, height, bulk, or ethnicity.

On December 12, 2002, in a written decision, the state court granted petitioner's motion to suppress the pretrial statement but held that, if petitioner elected to testify in his own behalf, the statement could be used on cross-examination. The court suppressed petitioner's statement because Meehan had not given petitioner Miranda warnings before questioning him. However, the court held that the statement was not the product of coercive conduct and could thus be used by the People on cross-examination if petitioner chose to testify.

The court denied petitioner's motion to suppress the identification evidence. In finding the identification evidence admissible, the court held that, considering the totality of the circumstances, the three identification procedures, the computer identification, the photo array, and the lineup, were proper. The procedures were neither unnecessarily suggestive nor conducive to a substantial likelihood of irreparable misidentification. First, the court found Maragh's identification of petitioner after viewing 1,000 photographs was not unduly suggestive because "the large number of photographs and 'the nature of the photographs viewed and the scope of the procedure involved militate against the presence of suggestiveness.'" Exhibit M: 8-9[3] (quoting *People v. Almo*, 157 A.D. 2d 608 (1st Dept. 1990), *app. den.* 75 N.Y. 2d 963).

The court also found there was no police impropriety with regard to the photo array. The court held that "the other photographs in the array strongly resembled the [petitioner] and there were no characteristic or visual clues which would have oriented the viewer towards selecting the [petitioner] as a participant in the crime." Exhibit M: 9. In addition, the court held "that the heights, weights, hairstyles, facial hair, and facial features of the other persons in the array resembled the [petitioner] so closely that the [petitioner's] photo, even with the written information on it, did not stand out in any respect from the others." Exhibit M: 10. The court

---

[3] References to "Exhibit" are to exhibits attached to the State's Opposition to Mr. Ragunauth's Habeas Petition.

found the markings indicating the age and physical descriptions of the fillers were "very close" to that of the petitioner. Exhibit M: 10. The court held that the written information next to the photographs would not have "caused the viewer to single out the [petitioner's] photograph for identification." Exhibit M: 10. Thus, considering the totality of the circumstances, the court held the procedures employed regarding the photographic array were not unduly suggestive such that there was a likelihood that defendant would be singled out for identification and were not likely to taint a subsequent in-court identification.

Finally, the court found the lineup was conducted in a fair and impartial manner since the fillers "sufficiently resembled the defendant with respect to their skin tones, age, height, facial and body features" and "they all wore baseball caps in a backwards fashion and looked sufficiently similar." Exhibit M: 11. In addition, petitioner was allowed to select his position for the lineup, and the witnesses were segregated prior to viewing the lineup. Thus, the court found "there was no suggestive behavior on the part of the police that led to the identification of the defendant at the lineup." Exhibit M: 11.

## II.    Trial and Judgment

At trial in New York Supreme Court, Queens County, Dualsky, Maragh, Meehan, and Dualsky's doctor testified for the prosecution. The People's evidence showed that on June 7, 2004, at approximately 10:30 p.m., as Dualsky walked home from a Bowling Alley with his girlfriend, Maragh, an armed man approached them demanding Dualsky turn over his valuables. Dualsky initially resisted, telling the assailant he was "making a mistake" and to "forget the whole thing" and "[g]o home " T: 239, 343.[4] However, after being shot in the groin, Dualsky handed his wallet containing approximately $200 to the assailant. Dualsky complied with a

---

[4]      References to "T" are to pages of the Trial Transcript attached to the State's Opposition to Mr. Ragunauth's Habeas Petition.

further demand for the gold chain around his neck. The assailant then shot Dualsky in the right hip and fled. As a result of his injuries, Dualsky spent five days in the hospital and underwent two surgeries.

The only issue at trial was whether petitioner was the assailant. The defense argued that petitioner was misidentified. However, in court, Dualsky identified petitioner as the assailant and testified about his pretrial identifications of petitioner. Dualsky described the scene of the crime as well-lit and said the assailant was facing the street light. During the encounter, Dualsky looked directly at the assailant and could see his face clearly. While he was in the hospital, Dualsky identified petitioner from a photo array but stated that, to be sure, he needed to see the man in person. After his release from the hospital Dualsky went to the precinct to view photographs. Dualsky asked Meehan to see the photo array he was shown in the hospital, and Dualsky again identified petitioner as his assailant. Dualsky subsequently identified petitioner in a lineup.

Maragh testified that, despite recognizing petitioner, she did not identify him during the lineup because she "wasn't sure" it was him and she "didn't want to jeopardize someone [sic] life if [she] wasn't sure." T: 352. In addition, Maragh identified petitioner in court as someone who "looks like" the assailant. T: 352.

The defense called no witnesses.

On February 10, 2004, petitioner was convicted by a jury of two counts of robbery in the first degree, N.Y. Penal Law §160.15(1), assault in the first degree, N.Y. Penal Law § 120.10(1), and criminal possession of a weapon in the second degree, N.Y. Penal Law §265.03. The court sentenced petitioner to concurrent determinate prison terms of 15 years each for the assault and robbery convictions, and eight years for the weapon conviction.

### III.    Direct Appeal

Petitioner appealed to the Appellate Division, Second Department, arguing that the court erred in admitting the identification evidence, the evidence was legally insufficient and the conviction was against the weight of the evidence, and the court impermissibly admitted testimony by a police officer regarding witnesses' description of the perpetrator. The Appellate Division affirmed petitioner's judgment. *People v. Ragunauth*, 24 A.D.3d 472 (2d Dep't 2005). First, the court held that the hearing court properly declined to suppress the identification evidence because "the participants in the photo array were sufficiently similar to the defendant in appearance so that there was little likelihood the defendant would be singled out for identification based on particular characteristics" and that "the alleged variations in appearance between the fillers and the defendant were not so substantial as to render the lineup impermissibly suggestive." *Id.* at 472-473.

Second, the court found petitioner's legal insufficiency claim unpreserved for appellate review. *Id.* at 473. It found, "in any event", the evidence legally sufficient to support a conviction. *Id.* Furthermore, the court held the conviction was consistent with the weight of the evidence. *Id.*

Finally, the court held the police officer's testimony recounting the descriptions of the perpetrator the witnesses gave him shortly after the crime was "properly admitted to assist the jury in evaluating the complainant's opportunity to observe the perpetrator at the time of the crime, and the jury was instructed to consider the testimony for this purpose." *Id.* (internal citations omitted).

On January 13, 2006, a judge of the New York Court of Appeals denied petitioner's application for leave to appeal.

**IV.      Motion to Vacate Judgment**

On August 16, 2006, petitioner moved to vacate the judgment against him pursuant to N.Y. Criminal Procedure Law § 440.10 claiming he was denied effective assistance of trial counsel because his attorney failed to call readily available alibi witnesses in a misidentification case and because the trial judge made improper comments to defense counsel.

In support of his motion, petitioner submitted affidavits from his mother-in-law, sister-in-law, father, and wife. Petitioner's mother-in-law, Linda Long, stated in her affidavit that she knew petitioner was home during the time of the crime because petitioner routinely arrived home between 7:00 p.m. and 9:00 p.m. and stayed home for the remainder of the night. In addition, Long stated petitioner routinely moved his car between 9:00 p.m. and 9:30 p.m. and at 10:00 p.m. or 10:30 p.m. she blocked petitioner's car with her car. Petitioner's sister-in-law, Linda Latrice Boyd, made similar statements in her affidavit, adding that she saw petitioner sleeping on the night of July 7, 2002. In his affidavit, petitioner's father, Ray Ragunauth, stated that he heard the court tell defense counsel, "this case is weak, you don't need much of a defense." The affidavit of petitioner's wife, Latoya Boyd-Ragunauth, was not provided to this court. However, the state court detailed the substance of her affidavit in its decision, noting Boyd-Ragunauth's statement that, on the night in question, petitioner arrived home between 7:00 and 9:00 p.m., played with his son, and went to bed between 9:30 and 10:00 p.m.

In response, the state submitted an affidavit from petitioner's trial counsel who stated that he had interviewed the witnesses and concluded "they were hopelessly inarticulate and would not survive even minimal cross-examination." Exhibit G. In addition, counsel stated that the potential alibi witnesses wrote down the wrong date when asked to write the date and time they

were with petitioner. Counsel stated that, after these interviews, petitioner agreed that the witnesses should not be called.

The court denied petitioner's motion without a hearing, concluding that counsel "made a well reasoned decision not to call the witnesses because of his determination that they would fail to prove valuable to the defendant." Exhibit I. The court found that petitioner's father's claim that the judge commented to defense counsel about the need to present a defense was "unfounded and either the mischaracterization of what he may have overheard at a bench conference with counsel for the People and defendant or a mishearing of the sidebar conference by the affiant." *Id.*

On December 15, 2006, petitioner requested leave from the Appellate Division, Second Department, to appeal the denial of his motion to vacate judgment. On February 27, 2007, the Appellate Division denied leave to appeal.

## DISCUSSION

### I. AEDPA

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub.L. No. 104-132, 110 Stat. 1214, a federal court may grant a writ of habeas corpus to a state prisoner on a claim that was "adjudicated on the merits" in state court only if it concludes that adjudication of the claim "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). Determinations of factual issues made by a state court "shall be presumed to

be correct," and the applicant "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." *Id.* § 2254(e)(1).

A state court decision is "contrary to" Supreme Court precedent "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000) (O'Connor, J., concurring and writing for the majority in this part). A state court decision is an "unreasonable application" of Supreme Court precedent "if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411. There must be "[s]ome increment of incorrectness beyond error," although "the increment need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence." *Francis S. v. Stone*, 221 F.3d 100, 111 (2d Cir. 2000) (internal quotations omitted).

### A.     Petitioner's Claims

Petitioner claims that: (1) identification testimony was erroneously admitted because pretrial identification procedures were unduly suggestive; (2) the evidence against him was legally insufficient to prove his guilt; (3) testimony by a police officer regarding a witnesses' description of the perpetrator was impermissibly admitted; and (4) he was denied the effective assistance of trial counsel.

### 1.       Identification Evidence

Petitioner claims, as he did on direct appeal, that, because pretrial identification procedures were unduly suggestive, the state court violated his Fifth Amendment right to due process of law when it admitted tainted identification evidence.

Whether an identification procedure was so suggestive that it violates a defendant's due process rights is a mixed question of law and fact. *Sumner v. Mata*, 455 U.S. 591, 597 (1982)**.** As already noted, under 28 U.S.C. § 2254(e)(1), the findings of fact that underlie a state court's conclusion are presumed correct and may be rebutted only by clear and convincing evidence. *See Sanford v. Burge,* 334 F.Supp.2d 289, 301 (E.D.N.Y. 2004). Thus, this court must presume correct the state court's findings of fact regarding the identification procedures and then consider whether the state court's conclusion that the identification evidence was properly admitted was contrary to, or an unreasonable application of, clearly established Supreme Court precedent.

The "reliability of eyewitness identification testimony is usually an issue for jury determination," and may be excluded only to preserve a defendant's due process rights when "the degree of unreliability leads to 'a very substantial likelihood of irreparable misidentification.'" *Kennaugh v. Miller*, 289 F.3d 36, 43 (2d Cir. 2003) (quoting *Manson v. Brathwaite*, 432 U.S. 98, 116 (1977)). The court must consider "whether the pretrial identification procedures unduly and unnecessarily suggested that the [accused] was the perpetrator." *Raheem v. Kelly*, 257 F.3d 122, 133 (2d Cir. 2001). If the procedures were not unfairly suggestive, the court's inquiry ends and the reliability of the identification testimony becomes "'a matter for the jury.'" *Id.* (quoting *Foster v. California*, 394 U.S. 400, 442 n.2 (1969)). However, if the court determines that the identification procedures were unduly suggestive, it must then determine if, considering the totality of the circumstances, there is

sufficient evidence of reliability apart from the tainted identification. *See Neil v. Biggers*, 409

U.S. 188, 199-200 (1972). Thus, a suggestive procedure will not "in and of itself . . . violate due

process." *Vasquez v. Poole*, 331 F.Supp.2d 145, 150 (E.D.N.Y. 2004) (citing *Biggers*, 409 U.S.

at 198).

Here, petitioner argues that the pretrial identification procedures, the photo-array and

line-up identifications, were unduly suggestive, and that the suggestive photo array further

tainted the lineup.

### a.    The Photo Array

In determining whether a photo array is impermissibly suggestive, the court asks

"'whether the picture of the accused, matching descriptions given by the witness, so stood out

from all of the other photographs as to suggest to an identifying witness that [that person] was

more likely to be the culprit.'" *Velazquez v. Poole*, 2007 WL 3240550, *24 (E.D.N.Y. Oct. 30,

2007) (quoting *Jarrett v. Headley*, 802 F.2d 34, 41 (2d Cir. 1986)). "[W]hile the photographs

need not be uniform, an array 'must not be so limited that the defendant is the only one to match

the witness's description of the perpetrator.'" *Id.* (quoting *United States v. Maldonado-Rivera*,

922 F.2d 934, 974 (2d Cir. 1990)).

The photo array was available to the hearing court and the Appellate Division, but has

since been lost. Petitioner argues that this court should presume suggestiveness from the State's

loss of the photo array. However, no presumption of suggestiveness arises from the failure of the

police to preserve original photographic evidence. *Sales v. Harris*, 675 F.2d 532, 538 n.3 (2d Cir.

1982); *see also Ranta v. Bennett*, 2000 WL 1100082, *39 (E.D.N.Y. May 23, 2000) (noting that

"the mere fact that line-up identification photographs were inadvertently lost after trial does not

require that a presumption of suggestiveness be applied," and indicating that the "appropriate

focus" is whether the loss of the exhibit was a "result of bad faith") (internal citations and quotation marks omitted), *aff'd*, 189 Fed. Appx. 54 (2d Cir.2006). Here, there is no indication or contention that the loss of the photo array resulted from bad faith on the part of the State so this court will not presume suggestiveness.

In addition, petitioner's factual descriptions of the photo array are consistent with respondent's descriptions, the testimony before the hearing court, the testimony at trial, and the factual descriptions presented in both briefs to the Appellate Division. Thus, the factual descriptions of the photo array, including the descriptions of the ages and facial hair of the other individuals in the array, are not in dispute. Since the parties do not dispute the underlying factual description of the array, this court need not see the array to determine whether petitioner's claim has merit.

The state court's decision that the photo array was not unduly suggestive was neither contrary to, nor an unreasonable application of, clearly established Supreme Court precedent. *See* 28 U.S.C. § 2254 (d)(1). The Appellate Division reasonably held that "the participants in the photo array were sufficiently similar to the defendant in appearance so that there was little likelihood the defendant would be singled out for identification based on particular characteristics." *Ragunauth*, 24 A.D.3d at 473.

Petitioner argues that the state court's conclusion was unreasonable because the ages and facial hair of the individuals depicted in the photo array were substantially different from petitioner's age and appearance in his photograph included in the array. With respect to age, considering that the witnesses described the assailant as 19 to 20 years old and the photograph of petitioner was from when he was 17 years old, the state court reasonably concluded that including photographs in the array of individuals aged 18 to 22 would not make petitioner's

photograph "'so [stand] out from all of the other photographs as to suggest to an identifying witness that [that person] was more likely to be the culprit.'" *See Velazquez*, 2007 WL 3240550 at *24 (quoting *Jarrett*, 802 F.2d at 41). With respect to facial hair, while the witnesses never described the assailant as having facial hair, they also never described him as having no facial hair. Thus, the witnesses' failure to mention facial hair in their initial descriptions of the perpetrator does not imply that an individual with facial hair (petitioner had a slight mustache in his photograph) could not fit the description of the perpetrator. In sum, petitioner has failed to undermine the state court's factual findings or to show that the state court's legal conclusions were contrary to, or an unreasonable application of, clearly established Supreme Court precedent.

**b.     The Lineup**

"A lineup is unduly suggestive as to a given defendant if he meets the description of the perpetrator previously given by the witness and the other lineup participants obviously do not." *Raheem*, 257 F.3d at 134. There is no requirement that all line-up participants be identical in appearance. *Roldan v. Artuz*, 78 F.Supp.2d 260, 271 (S.D.N.Y. 1999) (gathering cases). Moreover, the "focus of the inquiry is not whether the suspect has a distinctive feature not shared by the other participants, but whether that feature matches the description provided by the witness." *West v. Greiner*, 2004 WL 315247, *5 (E.D.N.Y. Feb. 24, 2004). Here, the hearing court found that the fillers "sufficiently resembled the defendant with respect to their skin tones, age, height, facial and body features" and "they all wore baseball caps in a backwards fashion and looked sufficiently similar." Exhibit M: 11. The Appellate Division agreed, holding that "the alleged variations in appearance between the fillers and the defendant were not so substantial as to render the lineup impermissibly suggestive." *Ragunauth*, 24 A.D.3d at 472-473.

Petitioner argues that the state court's conclusion is an unreasonable application of the law to the facts of this case because the lineup fillers did not resemble him, and the "only filler whose physical appearance was remotely close to petitioner was that of a police officer who's ethnicity was Caucasian." However, the question before the state court was not whether the age or ethnicity of the fillers matched the petitioner, but whether the fillers appeared sufficiently similar to the witnesses' description of the assailant. Although, as petitioner contends, fillers number two, three, and four appeared heavier than the description given by the witnesses, they do appear to fit the description with respect to ethnicity, age, height, and facial features. Thus, because this is not a case where petitioner "meets the description of the perpetrator previously given by the witness and the other lineup participants obviously do not," *see Raheem*, 257 F.3d at 134, the state court did not act unreasonably in rejecting petitioner's challenge to the composition of the lineup.

Petitioner further argues that the lineup was tainted because Dualsky twice saw petitioner's photo in the photo array prior to viewing the lineup. However, "the law is clear that the police may use more than one identification procedure to identify suspects as long as the procedures utilized are fair and not suggestive." *Taylor v. Kuhlmann*, 36 F.Supp.2d 534, 551 (E.D.N.Y. 1999) (citing *People v. Carter*, 482 N.Y.S.2d 911 (2d Dep't 1984) (not improper to have witness view two photo arrays a few weeks before the lineup where procedures used were not suggestive)). Since the photo array viewed by the witness was not impermissibly suggestive, and the witness requested the second viewing, the state court acted reasonably in finding that the witness viewing petitioner two times in a photo array did not taint the subsequent lineup.

c.     **In-Court Identification Testimony**

If the court determines that the out-of-court identification procedures of petitioner were not unduly suggestive, the court's inquiry ends, and the reliability of the identification becomes a question for the jury. *See Raheem*, 257 F.3d at 133. Since the state court reasonably concluded that the out-of-court identification procedures in this case were not unduly suggestive, it was also reasonable for the state court to conclude the identification testimony here was permissible. Thus, it was unnecessary for the state court, and unnecessary for this court, to further determine whether Dualsky's in-court identification testimony was independently reliable.

### 2. Legal Insufficiency

Petitioner claims that the evidence produced at trial was legally insufficient to prove he was the assailant who shot and robbed Dualsky. Petitioner presented the same argument to the Appellate Division on direct appeal, and that Court held that petitioner's legal insufficiency claim was unpreserved for appellate review and, "in any event, viewing the evidence in the light most favorable to the prosecution . . . it was legally sufficient to establish defendant's guilt beyond a reasonable doubt." *Ragunauth*, 24 A.D.3d at 473.

A federal habeas court may not review a state prisoner's claim if that claim was defaulted in state court pursuant to a regularly followed independent and adequate state procedural rule, "unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). If a state court holding contains a plain statement that a claim is procedurally barred, then the federal habeas court may not review it, even if the state court also rejected the claim on the merits in the alternative. *See Harris v. Reed*, 489 U.S. 255, 264 n.10 (1989) ("a state court need not fear reaching the merits of a federal claim in an *alternative* holding" so long as it explicitly invokes a

state procedural rule as a separate basis for its decision). Where a state court says that a claim is "not preserved for appellate review" and then rules "in any event" on the merits, such a claim is procedurally barred from habeas review. *Glenn v. Bartlett*, 98 F.3d 721, 724–25 (2d Cir. 1996).

Here, the Appellate Division held petitioner's legal insufficiency claim unpreserved for appellate review and stated "in any event" the claim was meritless. In New York State, a defendant may not raise arguments on appeal concerning the legal sufficiency of the prosecution's evidence that were not raised with specificity in the trial court. N.Y.C.P.L. § 470.05(2); *People v. Gray*, 86 N.Y.2d 10, 19 (1995) ("even where a motion to dismiss for insufficient evidence was made, the preservation requirement compels that the argument be 'specifically directed' at the alleged error"). Petitioner asserts that the Appellate Division was wrong when it held his legal insufficiency claim was unpreserved, claiming the issue was fully preserved in a motion pursuant to N.Y.C.P.L. § 330.30 to set aside the verdict which he alleges to have filed on November 2, 2003. The record contains no record of such a motion.[5] Since petitioner has neither demonstrated cause and actual prejudice nor that failure to consider this claim will result in a fundamental miscarriage of justice, his legal insufficiency claim is procedurally barred from habeas review.

Even if this court could review petitioner's legal insufficiency claim, the claim fails on the merits. If, after reviewing the evidence in the light most favorable to the prosecution, the court finds that a rational trier of fact could have found proof of guilt beyond a reasonable doubt,

---

[5]     A § 330.30 motion may be made only after a guilty verdict and before sentencing. N.Y.C.P.L. § 330.30. Here, the jury announced its verdict on November 21, 2003 and the judge sentenced defendant on February 10, 2004. Therefore, petitioner could not have made a proper § 330.30 motion on November 2, 2003 because that date was before the verdict. The petitioner may be referring to his motion to dismiss two counts of the indictment at the conclusion of the prosecution's case. However, this motion alleged only that the prosecution failed to prove the necessary intent for the murder count and failed to prove Dualsky's injuries constituted "serious physical injuries" to support first degree assault counts.

the evidence is legally sufficient and habeas corpus must be denied. *Jackson v. Virginia*, 443 U.S. 307, 324 (1979). When conflicting inferences may be drawn from the record, the court must presume that the trier of fact resolved the conflict in favor of the prosecution and must defer to that resolution. *Wright v. West*, 505 U.S. 277, 296-297 (1992). Here, since the identification procedures were not unduly suggestive, the weight to which the eyewitness testimony is entitled at trial is a question of fact for the jury. *See Raheem*, 257 F.3d at 134. In addition, since the Appellate Division adjudicated the merits of this claim in an alternative holding, the court may grant habeas relief only if the Appellate Division's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C § 2254(d)(1).

It was not. Viewing the evidence in the light most favorable to the prosecution, a reasonable fact finder could have found beyond a reasonable doubt that petitioner robbed and assaulted Dualsky. Since the testimony of a single eyewitness is generally sufficient to support a conviction, the court need not look further than the testimony of Dualsky identifying petitioner. *See Huber v. Schriver*, 140 F.Supp.2d 265, 277-278 (E.D.N.Y. 2001). In addition, Dualsky testified that the lighting conditions were "very good" during the robbery and shooting and that he had sufficient opportunity to observe his assailant.

Maragh's testimony also supports a conviction. In court, Maragh pointed out petitioner as someone who "looks like" the assailant. She testified that she recognized petitioner during the lineup but did not identify him because she was not completely sure that he was the assailant. Viewing this evidence in the light most favorable to the prosecution, a reasonable juror could find Maragh's testimony supports Dualsky's positive identification of petitioner as the assailant and further strengthens the prosecution's case. Thus, the Appellate Division reasonably

concluded in its alternative holding that legally sufficient evidence supported petitioner's conviction.

In the alternative, petitioner argues his conviction was against the weight of the evidence. A "weight of the evidence" argument is based, not on federal law, but on a New York State statute permitting the Appellate Division to reweigh the evidence at trial to determine whether the verdict was against the weight of the evidence. C.P.L. § 470.15(5). Thus, "[c]hallenges to the weight of the evidence supporting a conviction are not cognizable on federal habeas review." *Robinson v. Ricks*, 2004 WL 1638171, *3 (E.D.N.Y. July 22, 2004) (citing *Maldonado v. Scully*, 86 F.3d 32, 35 (2d Cir. 1996)).

## C. Bolstering

Petitioner claims, as he did on direct appeal, that Meehan's testimony regarding descriptions of the assailant he received from Dualsky and Maragh improperly bolstered their identification testimony. He asserts that the admission of this testimony in violation of New York's rule against bolstering identifications violated his constitutional right to due process.

Courts in this circuit have consistently held that bolstering testimony does not violate due process. *Warren v. Conway,* 2008 WL 4960454, *21 (E.D.N.Y. Nov. 18, 2008)*; Diaz v. Greiner*, 110 F.Supp.2d 225, 234 (S.D.N.Y. 2000). Therefore, petitioner's bolstering claim is rejected.

## D. Ineffective Counsel

Petitioner claims he received ineffective assistance of trial counsel because his counsel failed to call three readily available alibi witnesses to testify on his behalf and was improperly influenced by a comment made by the trial judge. Petitioner raised these arguments in a § 440.10 motion and was denied relief on the merits without an evidentiary hearing. Therefore, to succeed

on this claim, petitioner must demonstrate that the state court's rejection of his claim was contrary to, or involved an unreasonable application of, clearly established Federal law.

The test of ineffective assistance of counsel is, first, that counsel's performance fell below "an objective standard of reasonableness" under "prevailing professional norms," and second, that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668 (1984). A court need not decide both prongs of the *Strickland* test if a party has made an insufficient showing on one. *Id*. at 697.

In assessing whether trial counsel's conduct was reasonable, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id*. at 689. "A lawyer's decision not to pursue a defense does not constitute deficient performance if, as is typically the case, the lawyer has a reasonable justification for the decision." *DeLuca v. Lord,* 77 F. 3d 578, 588 n.3 (2d Cir. 1996).

Similarly, "[t]he tactical decision of whether to call specific witnesses–even ones that might offer exculpatory evidence–is ordinarily not viewed as a lapse of professional representation." *United States v. Schmidt*, 105 F.3d 82, 90 (2d Cir. 1997). "At the same time, however, the decision not to call a witness must be grounded in some strategy that advances the client's interests." *Eze v. Senkowski*, 321 F.3d 110, 129 (2d Cir. 2003). Thus, counsel is not ineffective when, considering the circumstances, he reasonably decides not to call alibi witnesses. *See Reed v. Smith,* 2006 WL 929376, *6-8 (E.D.N.Y April 11, 2006); *Harris v. Hollins,* 1997 WL 633440, *6 (S.D.N.Y. Oct. 14, 1997); *Johnson v. Mann*, 1993 WL 127954, *1-2 (S.D.N.Y. April 20, 1993).

Here, the state court's rejection of petitioner's 440.10 motion claiming ineffective assistance of trial counsel was neither contrary to, nor an unreasonable application of, clearly established federal law under *Strickland*. In an affidavit, counsel explained that, after interviewing the potential witnesses, he concluded that presenting an alibi defense was "potentially disastrous" because the potential witnesses "were hopelessly inarticulate and would not survive even minimal cross-examination." Exhibit G: Singer Affirmation. Counsel further explained that, when asked to write down the date and time they were with the defendant, the potential witnesses provided a date that did not correspond with the date of the robbery. *Id.* After reviewing all of the evidence, the state court concluded that, after consulting with petitioner, who agreed with his strategy, counsel "made a well reasoned decision not to call the witnesses because of his determination that they would fail to prove valuable to the defendant." Exhibit I.

Petitioner contends that the state court's conclusion is unreasonable because "counsel had everything to gain and nothing to lose by calling the alibi witnesses who would have provided testimonies contesting the people's case." Further, petitioner attempts to minimize the significance of the witnesses providing the wrong date by explaining that the witnesses provided an alibi for June 8, 2002 because initial charges incorrectly stated that the robbery took place on that date. But regardless of the explanation, this discrepancy would have given the prosecution ammunition for impeachment if the witnesses ever testified.

In addition, as the state court found, the remainder of the record reflects effective overall performance by trial counsel. Counsel sought to exclude identification testimony at a suppression hearing, impeached identification testimony at trial by raising doubt about the reliability of the witnesses, and focused the jury on the alleged suggestive nature of the identifications. Counsel's presentation of a strong and coherent misidentification case further

supported his decision not to pursue an alibi defense. Therefore, the state court reasonably concluded his assistance was effective. *See Reed,* 2006 WL 929376, *6-8 (holding that counsel was not ineffective for not calling alibi witnesses with "credibility issues" where counsel attempted to impeach the state's witnesses); *Harris,* 1997 WL 633440, *6 (holding that counsel was not ineffective for not securing alibi witnesses where counsel presented a vigorous defense); *Johnson*, 1993 WL 127954, *1-2 (holding that counsel was not ineffective for strategic decision to attack identification of petitioner rather than to rely on an "inherently suspect" alibi defense).

Petitioner further claims that a comment made by the trail judge improperly influenced defense counsel, rendering him ineffective. Petitioner bases this claim on his father's affidavit submitted to the § 440.10 court that states that the judge told defense counsel that "this is a weak case and he don't need to put on a case" and that this led to defense counsel's decision not to call the alibi witnesses in an attempt to appease the judge. The state court found petitioner's father's claim was "unfounded and either the mischaracterization of what he may have overheard at a bench conference with counsel for the People and defendant or a mishearing of the sidebar conference by the affiant." Exhibit I. Because this factual finding carries a presumption of correctness, the petitioner has the burden of contradicting the state court's finding by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1). Petitioner offers no evidence other than re-submitting the affidavit from his father. Petitioner has not met his burden, and this court must presume the state court's finding is correct.

Thus, the state court reasonably held that petitioner received effective assistance of trial counsel.[6]

---

[6]     To the extent that petitioner's claim regarding the trial judge's alleged comment to defense counsel may be construed as a judicial misconduct claim, his claim is unexhausted, procedurally barred, and lacks merit. Since petitioner did not specifically claim judicial misconduct in his § 440.10 motion, the State never had the opportunity to adjudicate the issue and the claim is unexhausted. Since petitioner was in a position to adequately raise a judicial

## CONCLUSION

For the foregoing reasons, Ray Ragunauth's petition for a writ of habeas corpus is denied. Because petitioner has not made a substantial showing of the denial of a constitutional right, a certificate of appealability will not issue. 28 U.S.C. § 2253.

**SO ORDERED.**

_____/s_____
**NINA GERSHON**
**United States District Judge**

Dated: Brooklyn, New York
      December 23, 2008

---

misconduct claim but failed to do so in his § 440.10 motion, his claim is procedurally barred. In any event, petitioner has failed to show that the state trial judge's conduct was so fundamentally unfair as to deprive him of his right to due process. *See Gayle v. Scully*, 779 F.2d 802, 803 (2d Cir.1985). Other than re-submitting the affidavit from his father, petitioner offers no evidence that the complained-of comment ever occurred. Thus, as in his ineffective assistance claim, petitioner has failed to contradict the state court's finding that petitioner's father's claim was "unfounded and either the mischaracterization of what he may have overheard at a bench conference with counsel for the People and defendant or a mishearing of the sidebar conference by the affiant."